**MLG Automotive Law, APLC**
A Professional Law Corporation
Jonathan A. Michaels, Esq. – State Bar No. 180455
Kathryn J. Harvey, Esq. – State Bar No. 241029
Kianna C. Parviz, Esq. – State Bar No. 293568
2801 W. Coast Highway, Suite 370
Newport Beach, CA 92663
Telephone: (949) 581-6900
Facsimile: (949) 581-6908
(jmichaels@mlgautomotivelaw.com)
(kharvey@ mlgautomotivelaw.com)
(kparviz@ mlgautomotivelaw.com)

Attorneys for Plaintiff,
Jacob Sabatino

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| JACOB SABATINO, individually, and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br>          vs.<br><br>UBER TECHNOLOGIES, INC., a Delaware corporation; RASIER, LLC, a Delaware limited liability company; RASIER-CA, LLC, a Delaware limited liability company; RASIER-DC, LLC, a Delaware limited liability company; RASIER-PA, LLC, a Delaware limited liability company; and DOES 1 to 25, inclusive,<br><br>                    Defendants. | Case No.<br><br>CLASS ACTION<br><br><br>**CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**<br><br><br>JURY TRIAL DEMANDED |

Plaintiff Jacob Sabatino, on behalf of himself and all others similarly situated, brings this class action against Defendants Uber Technologies, Inc., Raiser, LLC, Raiser-CA, LLC, Raiser-DC, LLC and Raiser-PA, LLC (collectively referred to as "Defendants" or "Uber") and alleges, based upon personal knowledge as to himself and his own facts, and as to all others matters upon information and belief, as follows:

## I.

### __THE PARTIES__

1.    Plaintiff Jacob Sabatino is an individual consumer over the age of 18, residing in Aliso Viejo, California, County of Orange.  Plaintiff Jacob Sabatino has registered for an Uber account, and has used his Uber App to obtain and pay for an Uber ride in Orange County, California.

2.    Defendant Uber Technologies, Inc. is a Delaware corporation with its principal place of business in San Francisco, California, operating under California Entity Number C3318029.

3.    Defendant Rasier, LLC is a Delaware limited liability company with its principal place of business in San Francisco, California, operating under California Entity Number 201323810228.  Rasier, LLC is a wholly owned subsidiary of Uber Technologies, Inc.

4.    Defendant Rasier-CA, LLC is a Delaware limited liability company with its principal place of business in San Francisco, California, operating under California Entity Number 201326310085.   Rasier-CA, LLC is also wholly owned subsidiary of Uber Technologies, Inc.

5.      Upon information and belief, Defendant Rasier-DC, LLC is a Delaware limited liability company with its principal place of business in San Francisco, California.  Raiser-DC, LLC is not registered to do business in California.  Raiser-DC, LLC's Delaware File Number is 5395889.  Rasier-DC, LLC is also wholly owned subsidiary of Uber Technologies, Inc.

6.      Upon information and belief, Defendant Rasier-PA, LLC is a Delaware limited liability company with its principal place of business in San Francisco, California.  Raiser-PA, LLC is not registered to do business in California.  Raiser-PA, LLC's Delaware File Number is 5515373.  Rasier-PA, LLC is also wholly owned subsidiary of Uber Technologies, Inc.

7.      Defendant and its subsidiaries, affiliates, and other related entities, and its respective employees were the agents, servants and employees of Defendant, and each was acting within the purpose and scope of that agency and employment.

8.      Whenever reference is made to any act by Defendant or its subsidiaries, affiliates, and other related entities, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents, and/or representatives of Defendant committed, knew of, performed, authorized, ratified and/or directed that act or transaction for Defendant while engaged in the scope of their duties.

## II.
## <u>JURISDICTION AND VENUE</u>

9.      This Court has jurisdiction over the subject matter presented by this Complaint because it is a class action arising under 28 U.S.C. § 1332(d), which, under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), explicitly provides for the original jurisdiction of the federal courts of any class action in which any member of the class is a citizen of a state different from any defendant, and in which the matter in controversy

exceeds in the aggregate the sum of $5,000,000, exclusive of interest and costs.  Plaintiff alleges that the total claims of individual Class Members are in excess of $5,000,000 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2).

10.     This Court has personal jurisdiction over Defendant, because Defendant engaged in significant business throughout the State of California thus providing the State of California with general jurisdiction.

11.     Venue in this District is proper under 28 U.S.C. § 1391(b) because Defendant, as a corporation, is deemed to reside in any district in which it is subject to personal jurisdiction. Moreover, venue is proper in the Northern District of California (San Francisco Division) because Defendant is headquartered in this District, conducts business in this District and many of the acts complained of occurred in this District.

12.     The deceptive practices alleged herein were conceived, reviewed, approved and otherwise controlled from Defendants' headquarters in San Francisco, California.  Furthermore, the misrepresentations and omissions alleged herein were contained on Defendants' website and mobile phone application which are maintained in California, and were disseminated uniformly to consumers throughout the United States.  Each of Defendants' actions, deceptive practices, misrepresentations and omissions alleged herein impacts consumers uniformly throughout the United States.  When Plaintiff and class members used Defendants' services, those transactions, including the billing and payment for those services, were processed on Defendants' servers in San Francisco, California.

13.     At the time of the transactions alleged herein, Defendants' terms and conditions for its service provided that:

> This Agreement shall be governed by California law, without regard to the choice or conflicts of law provisions of any

jurisdiction, and any disputes, actions, claims or causes of action arising out of or in connection with this Agreement or the Service of Software shall be subject to the exclusive jurisdiction of the state and federal courts located in the City and County of San Francisco, California.

## IV.

## FACTUAL ALLEGATIONS

### *Uber Helps to Create the Rideshare Industry*

14.     Launched in San Francisco, California, in June 2010, Defendant Uber Technologies, Inc. operates as a "transportation network company" throughout the world.  In a relatively new industry called "ridesharing," Uber connects drivers and riders through a downloadable smartphone app called "Uber;" through this app, parties are able to arrange and pay for local transportation services.

15.     Uber concentrates much of its logistical efforts on fulfilling the supply side of the formula.  To provide the army of drivers needed to support the business model, Uber solicits and retains thousands of non-professional drivers throughout the United States who are willing to use their personal vehicles for rideshare services.  As its website states, "Uber needs partners like you.  Drive with Uber and earn great money. . .  Get paid weekly just for helping your community of riders get rides around town."  (If you don't have a car, Uber will also provide subprime auto financing to get you into vehicle within days.)  The company then makes these drivers available to the consuming public through its smartphone app.

16.     The process to become an Uber rider is simple:  Create an Uber account online, store your credit card information in your user profile, and then download the app to a smartphone.  To arrange a trip, simply click on the app, request an Uber car, and then pay for

the ride with your credit card on file.  Uber makes its money by retaining up to 25 percent of the fare paid.

17.     To cater to all different types of consumers, Uber has created a variety of rideshare platforms which are differentiated by the size and status of the vehicle, the number of riders, and the fare charged.  Uber currently offers six different services:

| UberX | Non-luxury sedan |
| UberPLUS | Moderate luxury sedan |
| UberBLACK | Luxury sedan |
| UberXL | Non-luxury SUV |
| UberSUV | Luxury SUV |
| UberPOOL | Different riders in a single car |

*Uber Recognizes that Putting Members of the Public*
*in Strangers' Personal Cars Is Inherently Dangerous*

18.     Fundamental to Uber's model is the inherent concept that members of the consuming public will be stepping into the backseat of a stranger's private car with virtually no oversight or protection.  There are no security cameras, no special markings on the cars, and no sense of company or authoritative oversight.

19.     Because of the enormous potential for things to go wrong, Uber has taken steps to shield itself from liability.  Rather than hire the drivers directly, Uber has created wholly-owned subsidiaries – Defendants Rasier, LLC, Rasier-CA, LLC, Rasier-DC, LLC and Rasier-PA, LLC – who "license" the smartphone technology from Uber, and then hire the drivers for the rideshare services.  By engaging in this corporate stacking, Uber can claim that it has "no association" with the drivers who are providing the rideshare services, even though it is the one

who organizes and controls all of the activities.   Uber also classifies all of the drivers as independent contractors, in an effort to cut off *respondeat superior* liability.

### Uber Materially Misleads the Public by Stating that
### Its Cars Are "the Safest on the Road."

20.     While most consumers would never think of driving off into the dark in the backseat of a stranger's car, Uber has gone to great lengths to convince its customers that rides with Uber are "the safest on the road."   Its website, which displays pictures of young women getting into Uber cars, states:

> Wherever you are around the world, Uber is committed to connecting you to the ***safest ride on the road***. That means setting the strictest safety standards possible, and then working hard to improve them every day.
>
> \* \* \*
>
> From the moment you request a ride to the moment you arrive, the Uber experience has been designed from the ground up with ***your safety in mind***.
>
> \* \* \*
>
> Uber works hard to ensure that we are connecting riders with the ***safest rides on the road***.
>
> \* \* \*
>
> Making cities better is at the heart of everything we do. It's much more than improving the way people get around. It's celebrating what makes those cities special, caring about the people who make them great, and being responsible citizens. That's why we work hard to ***keep our streets safe for everyone***, whether they're on foot, on a bike, or in another car.
>
> (Emphasis added).

21.     In conjunction with this, Uber claims that it conducts "industry-leading" background checks on its drivers.  As Uber's website states:

> Every ridesharing and livery driver is ***thoroughly screened through a rigorous process*** we've developed using constantly improving standards. This includes a three-step criminal background screening for the U.S – with county, federal and multi-state check that go back as far as the law allows – and ongoing reviews of drivers' motor vehicle records throughout their time on Uber.

\* \* \*

> All Uber Ridesharing and livery partners must go through a ***rigorous background check***. The three-step screening we've developed across the United States, which includes county, federal and multi-state checks, has set a new standard.

(Emphasis added).

22.   Uber's statements to the public are designed to dispel the concern that many would have about getting into the backseat of a stranger's car.  The truth, however, is that Uber's security measures are negligible, at best.

23.   While Uber claims to conduct "industry-leading" background checks, the truth is that its background checks are outsourced to an online company called Hirease, LLC.  To become a driver, all that is required is: i) complete a short application on the Uber website; ii) submit your social security number; iii) submit two pictures of your car; iv) submit registration and proof of insurance; and v) submit the Uber vehicle inspection form, indicating that the car was inspected by a service center.

24.   Critically, ***no one ever meets the applicant*** – not Uber, not Rasier and not Hirease – and there are no measures undertaken to ensure that the applicant is who he says he is. Uber does not verify that the social security number given is, in fact, the applicant's; it does not verify that the pictures of the car are actually the applicant's car; and it does not verify that the Uber vehicle inspection form is not just filled out by the applicant.

**CLASS ACTION COMPLAINT**

25.     Uber fails to undertake these minimal safety measures despite knowing that job applicants frequently submit false information to their employers.  Even Uber's choice of background companies, Hirease, acknowledges that many job applicants lie about information they submit to an employer.  As Hirease states on its website, "40% of resumes contain material lies or omissions about education, past employment or qualifications."  Hirease also recognizes the importance of background checks to weed out applicants with criminal backgrounds.  As Hirease states, "10% of job applicants have a criminal record."

26.     The gold standard for background checks is Live Scan, a biometric fingerprint process that searches databases maintained by the Department of Justice and the FBI for prior criminal activity.  The Live Scan process also automatically updates when subsequent activity occurs, such as if a driver was arrested for drunk driving or rape.

27.     Uber's background checks do **not** use the Live Scan process, but rather the less expensive online service provided by Hirease that requires no fingerprinting.  Because of the complete lack of thoroughness of this process, Hirease states on every background check it does for Uber:  "Hirease does not guarantee the accuracy or truthfulness of the information in this report as to the subject of the investigation."

28.     In its effort to mislead the public into believing that its services are the safest available, Uber claims that its background checking process and standards are "often more rigorous than what is required to become a taxi driver."  This too is untrue.  In San Francisco, the city in which Uber is based, the following is required to become a taxi driver: i) attend a seven-hour class on taxi driving; ii) take and pass an exam administered by the San Francisco Municipal Transportation Agency; iii) personally appear for an interview by the San Francisco Municipal Transportation Agency; iv) submit to a Live Scan biometric fingerprint examination; and v) submit a 10-year printout of the applicant's DMV driving record that is current within 30

days. Uber doesn't even come close to these requirements; it requires no class, no test, no personal appearance, no Live Scan, and no 10-year DMV printout.

29. Uber also claims to have "best-in-class insurance coverage," but in truth Uber's commercial insurance policy is issued by James River Insurance Company, a non-admitted carrier, unlicensed by the California Department of Insurance.

### *Uber Fails to Offer Its Drivers Any Type of Training or Supervision*

30. Unlike the San Francisco Municipal Transportation Agency, which requires taxicab drivers to attend a seven-hour class and take and pass an examination, Uber offers no training whatsoever for its drivers. The online Uber application concludes with a requirement that the candidate watch a 13-minute video on how to use the Uber app. Uber offers no training on driving skills; no training on how to drive while constantly using a mobile device (which is necessary, given that the service is completely app based); no training on how to deal with intoxicated or unruly customers; and no training on what to do in an emergency situation. In fact, Uber provides no method for an Uber driver to call the company in the event of a dispute, altercation or emergency. If the drivers want any type of training, they must pay as much as $65 for a four-hour driving skills class.

31. Similarly, Uber provides no supervision or oversight of its drivers. Once the drivers are signed up, they are free to roam as they please.

32. Because Uber itself knows of the danger presented by its services, it attempts to disclaim any liability. In stark contrast to its boastful advertising that it has the "safest rides on the road," buried deep in its terms and conditions, Uber states:

Uber does not guarantee the suitability, safety or ability of third party providers. . . . By using the services, you acknowledge that you may be exposed to situations involving third party providers that are potentially ***unsafe, offensive, harmful*** to minors, or otherwise objectionable, and that use of third party providers arranged or scheduled using the service is at your own risk and judgment. Uber shall not have any liability arising from or in any way related to your transactions or relationship with third party providers.

(Emphasis added).

### *Uber Has Been Consistently Violating*
### *California's Public Utilities Laws*

33.     When Uber began offering services in California, it did so with complete disregard for the state's Public Utilities Commission – the regulatory agency that governs common carriers.  It sought no permit from the PUC to provide rideshare services for a fee.

34.     On November 13, 2012, the California Public Utilities Commission fined Uber $20,000 for operating "as a charter-party carrier of passengers without an operating authority," in violation of California Public Utilities Code § 5371 and 5413.5.  It was not until April 7, 2014, that Uber's subsidiary, Riser-CA, was issued a permit to operate as a charter-party carrier of passengers (Permit No. TCP0032512-P).

35.     On September 19, 2013, in response to concerns for public safety as a result of the increasing popularity of Uber and other "ridesharing" companies, the California Public Utilities Commission issued a wide-sweeping decision (No. 13-09-045), designed to "to ensure that public safety is not compromised by the operation of this new transportation business model."  The decision sought to lay a regulatory framework for companies such as Uber.

36.     Despite the clear-cut guidelines set forth in CUP Decision No. 13-09-045, Uber is violating the Decision in the following respects:

| CUP Regulation | Uber's violation |
|---|---|
| "We require the Transportation Network Company (TNC) or an authorized third party facility licensed by the California Bureau of Automotive Repair to conduct and ensure that each vehicle passes a 19-point vehicle inspection prior to allowing a vehicle to be driven as part of the TNC's service." | Uber requires that drivers submit a vehicle inspection form, but it provides no oversight to ensure that the applicants don't fill out the forms themselves – something they could easily do. |
| "We require TNCs to maintain commercial liability insurance policies providing not less than $1,000,000 (one million dollars) per-incident coverage for incidents involving vehicles and drivers while they are providing TNC services. . . . This insurance requirement shall be disclosed on each TNC's app and website. " | Uber maintains a $1 million policy from a non-admitted carrier, but this is only during the time that the driver is engaged with a rider. When a driver is available and looking for a rider, the policy does not apply. Uber tells its drivers that "most personal auto insurance will provide coverage," but this is untrue.<br><br>Personal auto policies typically do **not** cover events that occur during ridesharing activities. Geico, one of the nation's largest auto carriers, defines ridesharing as "the use of any vehicle by any insured in connection with a transportation network company from the time an insured logs on to or signs in to any computer or digital application or platform that connects or matches driver(s) with passenger(s) until the time an insured logs out of or signs off of any such application or platform, including while en route to pick up passenger(s) and while transporting passenger(s)."<br><br>In addition, Uber does not disclose on its app or its website the fact that it is required to provide $1 million of coverage "while they are providing TNC services." |

| | |
|---|---|
| "TNC drivers shall be required to provide proof of both their personal insurance and the commercial insurance in the case of an accident." | Uber tells its drivers to carry evidence of the commercial insurance with them, but there is no oversight or spot checking to see if drivers are complying with the requirement. |
| "The TNC shall include on its website, mobile application and riders' receipts, notice/information on the TNC's zero-tolerance policy and the methods to report a driver whom the rider reasonably suspects was under the influence of drugs."<br><br>"The website and mobile application must include a phone number or in-app call function and email address to contact to report the zero-tolerance complaint."<br><br>"The website and mobile application must also include the phone number and email address of the Commission's Passenger Section: 1-800-894-9444 and CIU_intake@cpuc.ca.gov." | The Uber app does not contain any information about Uber's zero-tolerance policy, or methods for reporting a driver suspected of being under the influence. The app merely contains a button that links the consumer back to the Uber website, where the rider has to sift through all of Uber's terms and conditions to find any information about the policy.<br><br>In addition, while the Uber website does contain the Commission's phone number and email address, it is on a hidden page and can only be located by doing an online search for those specific terms. |
| "TNCs shall establish a driver training program to ensure that all drivers are safely operating the vehicle prior to the driver being able to offer service." | Other than a 13-minute video on how to use the Uber app, Uber has no driver training program whatsoever. |
| "TNC vehicles shall display consistent trade dress (i.e., distinctive signage or display on the vehicle) when providing TNC services that is sufficiently large and color contrasted as to be readable during daylight hours at a distance of at least 50 feet. The trade dress shall be sufficient to allow a passenger, government official, or member of the public to associate a vehicle with a particular TNC (or licensed transportation provider)." | The only trade dress Uber drivers have is a sticker on the lower passenger side of the windshield, measuring 4 inches by 4 inches. This sticker is not readable from 50 feet, nor is it sufficient to allow a passenger, government official, or member of the public to associate a vehicle with Uber.<br><br>In addition, there is no oversight or spot checking to see if any of the drivers are complying with the requirement to actually use the sticker Uber provides. |

**CLASS ACTION COMPLAINT**

| "Drivers for Transportation Network Companies are prohibited from accepting street hails from potential passengers." | In crowded metropolis areas, such as San Francisco, Uber drivers routinely drop off passengers and pick up street hailing passengers at the same time. Uber provides no oversight or spot checking to ensure that its drivers are complying with this requirement. |
|---|---|

37.     On November 22, 2014, Plaintiff Jacob Sabatino used the Uber App to obtain and pay for an Uber ride in Orange County, California.  Plaintiff relied on Defendants' representations that Uber provides, "the safest ride on the road" and "industry leading" background checks when making the decision to use the Uber App to obtain rideshare services. Had Plaintiff known that Defendants' do not have the safest ride on the road, do not use industry leading background checks, do not train or supervise their drivers, and are continuously violating California laws, he would not have used the Uber App to obtain a ride.

## V.

## CLASS ALLEGATIONS

38.     Plaintiff brings this class action under Rule 23 of the Federal Rules of Civil Procedure ("FRCP") and seeks certification of the claims and issues in this action pursuant to the applicable provisions of Rule 23. The proposed Class is defined as:

> All persons in the United States who have downloaded and used the "Uber" app to obtain service from one of Uber's rideshare services, including UberX, UberPLUS, UberBLACK, UberXL, UberSUV and/or UberPool.  This Class definition may be supplemented or extended to include persons using other Uber services discovered after the filing of this Complaint.  Excluded from the Class are officers and directors of Defendant, members of the immediate families of the officers and directors of Defendant, and the legal representatives, heirs, successors and assigns and any entity in which they have or have had a controlling interest in Defendant.

39.     Defendants' representation, practices, and omissions were applied uniformly to all Members of the Class during the Class Period, so that the questions of law and fact are common to all Members of the Class.  All Members of the Class were and are similarly affected by having been exposed to the misrepresentations and unfair business practices of Defendant, and the relief sought is for the benefit of Plaintiff and Members of the Class.

40.     The Class is so numerous that joinder of all Members would be impractical.  It is estimated that tens of thousands of Americans use the Uber services each year, making joinder impossible.

41.     Questions of law and fact common to each Class Member exist that predominate over questions affecting only individual Members, including, *inter alia*:

a.     Whether Defendants' practices and representations made in connection with the advertising, marketing and promotion of Uber services is deceptive, unlawful or unfair, thereby violating the Cal. Bus. & Prof. Code § 17200, *et seq.*;

b.     Whether Defendants' practices and representations made in connection with the advertising, marketing and promotion of Uber services is deceptive, unlawful or unfair, thereby violating the Cal. Bus. & Prof. Code § 17500, *et seq.*;

c.     Whether Defendants' conduct constitutes a violation of Cal. Civ. § 1770(a)(5);

d.     Whether Defendants' conduct constitutes a violation of Cal. Civ. § 1770(a)(7);

e. Whether Defendants' conduct constitutes a violation of Cal. Civ. § 1770(a)(9);

f. Whether Defendants' conduct constitutes a violation of Cal. Civ. § 1770(a)(14);

g. Whether Defendants' conduct injured consumers and, if so, the extent of the injury; and

h. Whether Plaintiff and Class Members are entitled to damages and the proper measure of such damages.

42. The claims asserted by Plaintiff are typical of the claims of the Class Members, as his claims arise from the same course of conduct by Defendant and the relief sought is common. Plaintiff, like all Class Members, was exposed to Defendants' misrepresentations and unfair business practices and suffered an injury.

43. Plaintiff will fairly and adequately represent and protect the interests of the Class Members. Plaintiff has retained counsel competent and experienced in both consumer protection and class action litigation.

44. Certification of this class action is appropriate under F.R.C.P. 23(b) because the above questions of law or fact common to the respective Members of the Class predominate over questions of law or fact affecting only individual Members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims.

45.     Absent a class action, it would be highly unlikely that Plaintiff or any other Class Members could protect their own interests because the cost of litigation through individual lawsuits would exceed any expected recovery.

46.     Certification is also appropriate because Defendant has acted or refused to act on grounds applicable to the Class, making appropriate final injunctive relief with respect to the Class as a whole.

47.     Further, given the large number of Uber users, allowing individual actions to proceed in lieu of a class action would risk yielding inconsistent and conflicting adjudications.

48.     A class action is a fair and appropriate method for the adjudication of this controversy, in that it will permit many claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that such individual actions would engender.

49.     The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued regarding the management of this class action.

## FIRST CLAIM FOR RELIEF

**Cal. Bus. & Prof. Code § 17200, *et seq*.**

**(Unfair Competition)**

50.     Plaintiff repeats every allegation contained in the paragraphs above and incorporates such allegations by reference.  Plaintiff brings this cause of action on behalf of himself and the Class.

51.     Plaintiff Jacob Sabatino brings this cause of action in a representative capacity, and on behalf of the members of the Class.  Plaintiff is an Uber account-holder and user who has suffered a direct injury and lost money as a result of the Defendants' unfair competition.

52.     California Bus. and Prof. Code § 17200 et seq. makes it unlawful for any person to engage in "any unlawful, unfair or fraudulent business act or practice."

53.     The Defendants have engaged in business acts that are **unfair** in the following particulars:

        a.      Advertising that their cars are "the safest on the road," when the Defendants i) use substandard background checks, ii) fail to personally meet their drivers, iii) have no training programs of any kind for their drivers, iv) have no supervision or oversight of their drivers, v) have no security measures in place to ensure that their drivers' vehicle inspections are not falsified, and vi) do not verify that the photographs of their drivers' cars are actually the applicant's car.

        b.      Advertising that they conduct "industry-leading" background checks on their drivers, when the Defendants i) do not use the Live Scan biometric fingerprinting process, ii) fail to personally meet their drivers, iii) do not verify that the social security number used by the an applicant is actually his number, and iv) are told by their background company, Hirease, that the information in the reports is not necessarily reliable.

        c.      Advertising that their background checking process and standards are "often more rigorous than what is required to become a taxi driver," when the taxicab application process used by the San Francisco Municipal Transportation Agency – the agency in the same city as Uber – is infinitely more rigorous than the Defendants'.

d.      Advertising that they have "best-in-class insurance coverage," when their commercial insurance policy is issued by James River Insurance Company, a non-admitted carrier, unlicensed by the California Department of Insurance.

e.      Informing their drivers that "most personal auto insurance will provide coverage" during the time that a driver is available and looking for a rider, when personal auto policies typically do not cover events that occur during any form of ridesharing activities.

54.    The Defendants have engaged in business acts that are **fraudulent** in the following particulars:

a.      Advertising that their cars are "the safest on the road," when the Defendants i) use substandard background checks, ii) fail to personally meet their drivers, iii) have no training programs of any kind for their drivers, iv) have no supervision or oversight of their drivers, v) have no security measures in place to ensure that their drivers' vehicle inspections are not falsified, and vi) do not verify that the photographs of their drivers' cars are actually the applicant's car.

b.      Advertising that they conduct "industry-leading" background checks on their drivers, when the Defendants i) do not use the Live Scan biometric fingerprinting process, ii) fail to personally meet their drivers, iii) do not verify that the social security number used by the an applicant is actually his number, and iv) are told by their background company, Hirease, that the information in the reports is not necessarily reliable.

c.      Advertising that their background checking process and standards are "often more rigorous than what is required to become a taxi driver," when the taxicab application process used by the San Francisco Municipal Transportation Agency – the agency in the same city as Uber – is infinitely more rigorous than the Defendants'.

d.      Advertising that they have "best-in-class insurance coverage," when their commercial insurance policy is issued by James River Insurance Company, a non-admitted carrier, unlicensed by the California Department of Insurance.

e.      Informing their drivers that "most personal auto insurance will provide coverage" during the time that a driver is available and looking for a rider, when personal auto policies typically do not cover events that occur during any form of ridesharing activities.

55.     The Defendants have engaged in business acts that are **unlawful** in the following particulars:

a.      Failing to verify that their drivers' vehicle inspection forms are not falsified, in violation of CUP Decision No. 13-09-045 and California Public Utilities Code §5411.

b.      Failing to disclose on the Uber app and the Uber website the fact that they are required to provide $1 million of coverage "while they are providing TNC services," in violation of CUP Decision No. 13-09-045 and California Public Utilities Code §5411.

c.      Failing to verify that their drivers carry evidence of commercial insurance with them, in violation of CUP Decision No. 13-09-045 and California Public Utilities Code §5411.

d.      Failing to include on the Uber app information about Uber's zero-tolerance policy, in violation of CUP Decision No. 13-09-045 and California Public Utilities Code §5411.

e.      Failing to include on the Uber app methods for reporting a driver suspected of being under the influence, in violation of CUP Decision No. 13-09-045 and California Public Utilities Code §5411.

f.      Failing to include on the Uber website the California Public Utilities Commission's phone number and email address, in violation of CUP Decision No. 13-09-045 and California Public Utilities Code §5411.

g.      Failing to provide their drivers with a driver training program, in violation of CUP Decision No. 13-09-045 and California Public Utilities Code §5411.

h.      Failing to have their drivers display on their vehicles consistent trade dress readable from 50 feet, and failing to have their drivers display on their vehicles consistent trade dress sufficient to allow a passenger, government official, or member of the public to associate a vehicle with Uber, in violation of CUP Decision No. 13-09-045 and California Public Utilities Code §5411.

i.      Failing to ensure that their drivers do not accept street hails from potential passengers, in violation of CUP Decision No. 13-09-045 and California Public Utilities Code §5411.

j.      Violating Cal. Civil Code §§ 1770(a)(5), 1770(a)(7), 1770(a)(9)  and 1770(a)(14) by advertising that their cars are "the safest on the road," when the Defendants i) use substandard background checks, ii) fail to personally meet their drivers, iii) have no training programs of any kind for their drivers, iv) have no supervision or oversight of their drivers, v) have no security measures in place to ensure that their drivers' vehicle inspections are not falsified, and vi) do not verify that the photographs of their drivers' cars are actually the applicant's car.

k.     Violating Cal. Civil Code §§ 1770(a)(5), 1770(a)(7), 1770(a)(9) and 1770(a)(14) by advertising that they conduct "industry-leading" background checks on their drivers, when the Defendants i) do not use the Live Scan biometric fingerprinting process, ii) fail to personally meet their drivers, iii) do not verify that the social security number used by the an applicant is actually his number, and iv) are told by their background company, Hirease, that the information in the reports is not necessarily reliable.

l.     Violating Cal. Civil Code §§ 1770(a)(5), 1770(a)(7), 1770(a)(9) and 1770(a)(14) by advertising that their background checking process and standards are "often more rigorous than what is required to become a taxi driver," when the taxicab application process used by the San Francisco Municipal Transportation Agency – the agency in the same city as Uber – is infinitely more rigorous than the Defendants'.

m.     Violating Cal. Civil Code §§ 1770(a)(5), 1770(a)(7), 1770(a)(9) and 1770(a)(14) by advertising that they have "best-in-class insurance coverage," when their commercial insurance policy is issued by James River Insurance Company, a non-admitted carrier, unlicensed by the California Department of Insurance.

56.    The utility of Defendants' practices related to the advertising, marketing and promotion of their services is negligible, if there is any utility at all, when weighed against the harm caused by misrepresenting the facts to the general public and members of the Class.

57.    The adverse impact upon members of the general public and the Class who used Uber's services outweighs any reasons or justifications by Defendants for the unfair business practices the Defendants employed.

58.    Defendants had an improper motive (profit before accurate marketing) in their practices related to the advertising, marketing and promotion of their services.

59.     Using such unfair business acts and practices was and is under the sole control of Defendants, and was deceptively concealed from Plaintiff, other members of the Class, and the general public such that they could not reasonably determine this inaccuracy prior to utilizing Defendants' services.

60.     These deceptive acts and practices had a capacity, tendency, and likelihood to deceive and confuse reasonable consumers into believing Defendants' services had qualities they do not have.

61.     As a direct and proximate result of Defendants' unfair, fraudulent and unlawful business practices, Plaintiff and members of the Class have suffered damages in that they have expended money and risked their safety and wellbeing using Defendants' unsafe and unregulated rideshare service.  Plaintiff and members of the Class are therefore entitled to i) injunctive relief, ii) restitution of all monies acquired by Defendants from the members of the Class, and iii) attorneys' fees and costs incurred in bring this claim.

## SECOND CLAIM FOR RELIEF

### Cal. Bus. & Prof. Code § 17500, *et seq*.

### (False Advertising)

62.     Plaintiff repeats every allegation contained in the paragraphs above and incorporates such allegations by reference.  Plaintiff brings this cause of action on behalf of himself and the Class.

63.     Plaintiff Jacob Sabatino brings this cause of action in a representative capacity, and on behalf of the members of the Class.  Plaintiff is an Uber account-holder and user who has suffered a direct injury and lost money as a result of the Defendants' false advertising.

64.     California Bus. and Prof. Code § 17500 et seq. makes it unlawful for any entity, with the direct or indirect intent to perform services, to disseminate before the public any statement that is untrue or misleading.

65.     The Defendants have disseminated to the public through their advertising, website and smartphone app the following statements that are untrue or misleading:

        a.     Statements that their cars are "the safest on the road," when the Defendants i) use substandard background checks, ii) fail to personally meet their drivers, iii) have no training programs of any kind for their drivers, iv) have no supervision or oversight of their drivers, v) have no security measures in place to ensure that their drivers' vehicle inspections are not falsified, and vi) do not verify that the photographs of their drivers' cars are actually the applicant's car.

        b.     Statements that they conduct "industry-leading" background checks on their drivers, when the Defendants i) do not use the Live Scan biometric fingerprinting process, ii) fail to personally meet their drivers, iii) do not verify that the social security number used by the an applicant is actually his number, and iv) are told by their background company, Hirease, that the information in the reports is not necessarily reliable.

        c.     Statements that their background checking process and standards are "often more rigorous than what is required to become a taxi driver," when the taxicab application process used by the San Francisco Municipal Transportation Agency – the agency in the same city as Uber – is infinitely more rigorous than the Defendants'.

        d.     Statements that they have "best-in-class insurance coverage," when their commercial insurance policy is issued by James River Insurance Company, a non-admitted carrier, unlicensed by the California Department of Insurance.

66.     As a direct and proximate result of Defendants' untrue and misleading statements, Plaintiff and members of the Class have suffered damages in that they have expended money and risked their safety and wellbeing using Defendants' unsafe and unregulated rideshare service.  Plaintiff and members of the Class are therefore entitled to i) injunctive relief, ii) restitution of all monies acquired by Defendants from the members of the Class, and iii) attorneys' fees and costs incurred in bring this claim.

### THIRD CLAIM FOR RELIEF

### Cal. Civil Code § 1770, *et seq.*

### (Consumer Legal Remedies Act)

67.     Plaintiff repeats every allegation contained in the paragraphs above and incorporates such allegations by reference.  Plaintiff brings this cause of action on behalf of himself and the Class.

68.     Plaintiff Jacob Sabatino brings this cause of action in a representative capacity, and on behalf of the members of the Class.  Plaintiff is an Uber account-holder and user who has suffered a direct injury and lost money as a result of the Defendants' unlawful acts.

69.     Plaintiff Jacob Sabatino and members of the Class are "consumers," as defined by Cal. Civ. Code § 1761(d).

70.     Defendants are "persons," as defined by California Civil Code § 1761(c).

71.     Defendants have engaged in business acts that are unfair and deceptive in the following particulars, in violation of Cal. Civ. Code §§ 1770(a)(5), 1770(a)(7), 1170(a)(9) and 1770(a)(14):

a.      Advertising that their cars are "the safest on the road," when the Defendants i) use substandard background checks, ii) fail to personally meet their drivers, iii) have no training programs of any kind for their drivers, iv) have no supervision or oversight of their drivers, v) have no security measures in place to ensure that their drivers' vehicle inspections are not falsified, and vi) do not verify that the photographs of their drivers' cars are actually the applicant's car.

b.      Advertising that they conduct "industry-leading" background checks on their drivers, when the Defendants i) do not use the Live Scan biometric fingerprinting process, ii) fail to personally meet their drivers, iii) do not verify that the social security number used by the an applicant is actually his number, and iv) are told by their background company, Hirease, that the information in the reports is not necessarily reliable.

c.      Advertising that their background checking process and standards are "often more rigorous than what is required to become a taxi driver," when the taxicab application process used by the San Francisco Municipal Transportation Agency – the agency in the same city as Uber – is infinitely more rigorous than the Defendants'.

d.      Advertising that they have "best-in-class insurance coverage," when their commercial insurance policy is issued by James River Insurance Company, a non-admitted carrier, unlicensed by the California Department of Insurance.

72.     As a direct and proximate result of Defendants' unfair and deceptive business practices, Plaintiff and members of the Class have suffered damages in that they have expended money and risked their safety and wellbeing using Defendants' unsafe and unregulated rideshare service.  Plaintiff and members of the Class are therefore entitled to i) injunctive relief, ii) restitution of all monies acquired by Defendants from the members of the Class, and iii) attorneys' fees and costs incurred in bring this claim.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, for himself and all others similarly situated, prays for relief against Defendants, jointly and severally under each Claim for Relief in this Complaint as follows:

1.　　For an order certifying the Class and appointing Plaintiff's counsel as Class Counsel;

2.　　For an order enjoining Defendants as follows:

　　　　a.　　From engaging in business acts that are unfair, fraudulent or unlawful.

　　　　b.　　From making statements that are untrue or misleading.

　　　　c.　　From engaging in business acts that are unfair and deceptive.

3.　　For an order restoring all monies acquired by Defendants from the members of the Class.

4.　　For an order awarding attorneys' fees incurred in bring this claim, pursuant to Cal. Code Civ. Proc. § 1021.5 and Cal. Civil Code § 1780(e).

5.　　For an order awarding interest at the legal rate.

6.　　For an order awarding costs incurred in bring this claim.

7.      For an order providing such further relief as may be found just and proper.


**MLG Automotive Law, APLC**

Dated:  January 26, 2015               By:       */s/ Jonathan A. Michaels*
                                                Jonathan A. Michaels, Esq.
                                                Kathryn J. Harvey, Esq.
                                                Kianna C. Parviz, Esq.
                                                Attorneys for Plaintiff,
                                                Jacob Sabatino

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

MLG AUTOMOTIVE LAW, APLC

Dated: January 26, 2015          By:          /s/ Jonathan A. Michaels
                                              Jonathan A. Michaels, Esq.
                                              Kathryn J. Harvey, Esq.
                                              Kianna C. Parviz, Esq.
                                              Attorneys for Plaintiff,
                                              Jacob Sabatino